Joline v City of New York (2004 NY Slip Op 50164(U))

[*1]

Joline v City of New York

2004 NY Slip Op 50164(U)

Decided on March 25, 2004

Supreme Court, Queens County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on March 25, 2004

Supreme Court, Queens County
 RICHARD JOLINE, etc., et al., plaintiffs,
against
THE CITY OF NEW YORK, et al., defendants.
INDEX NO. 16528/01

ELLIOT, David, J.
In this action to recover damages for negligence, wrongful death, conscious pain and suffering, products liability, breach of express and implied warranties, strict products liability, loss of consortium and loss of services, defendant Laerdal Medical Corporation seeks an order granting summary judgment dismissing the complaint in its entirety. Defendants, The City of New York, The New York City Fire Department and the New York City Health and Hospitals Corporation (hereinafter "City defendants"), cross-move for an order granting summary judgment dismissing the complaint.
 On August 12, 2000, Toni Ann Joline and her mother, Columbia Anne Schwartz, were traveling on the Van Wyck Expressway in Queens on their way home from a wedding in Westchester County. It was approximately 12:30 A.M. and traffic was at a standstill due to an accident ahead of them which involved a jack-knifed tractor- trailer. Mrs. Joline, then 40 years old, was sitting in the driver's seat, with the car in park, when she passed out. Mrs. Schwartz testified at her deposition that just prior to passing out, her daughter told her that she was going to faint. Mrs. Schwartz got out of the car and called for help, and another motorist called 911. Mrs. Schwartz testified that the 911 operator told the motorist that there were five ambulances on the way to the accident and suggested that he flag one down. At 12:32 A.M. the motorist flagged down a New York City Fire Department EMT unit which was equipped with a Laerdal Heartstart 3000 defibrillator. Mrs. Schwartz testified that her daughter stopped breathing just before the ambulance personnel removed her from the car. The EMTs used the Heartstart 3000 defibrillator on Mrs. Joline to obtain an ECG and analyze her heart rhythm, and determined that the use of the defibrillator to shock her heart back to a normal sinus rhythm was appropriate. When the EMTs sought to give Mrs. Joline a defibrillator shock, the Heartstart 3000 unit gave a reading of "SERVICE MANDATORY" and failed to function. The EMTs switched to a back-up battery and the unit again read "SERVICE MANDATORY" and failed to function. The EMTs determined that Mrs. Joline was in cardiac arrest and requested an ALS (Advanced Life Support) unit at 12:36 A.M., which was en route by 12:37 A.M. By 12:42 A.M. the ALS unit had not arrived and no other ambulance unit had passed by to assist the tractor-trailer accident. The EMTs determined to transport Mrs. Joline to the nearest [*2]hospital and the ALS unit was cancelled. At 12:47 A.M. a paramedic unit and an EMT unit were assigned to assist and the paramedic unit was en route at 12:48 A.M. to meet the EMT unit on the north side of the Van Wyck Expressway. At 12:48 A.M. the EMT unit with Mrs. Joline was still stuck in traffic on the southbound side of the Expressway and did not clear traffic until a minute later and arrived at Jamaica Hospital at 12:58 A.M. The other two units that were requested to assist were cancelled. Mrs. Joline's heart was successfully defibrillated to normal sinus rhythm at Jamaica Hospital approximately a half hour after she first went into cardiac arrest. The half hour delay deprived her brain of oxygen, causing a hypoxic injury. Mrs. Joline never regained consciousness, suffered seizures and an infection, and was later diagnosed as being in a persistent vegetative state. Mrs. Joline was transferred to the traumatic brain injury unit of Peninsula Hospital Center on August 22, 2000, and remained at that facility through October 20, 2000, and then she was transferred to the Komanoff Center where she died on April 15, 2001.
The Laerdal Heartstart 3000 was designed and manufactured by defendant Laerdal Medical Corporation, and was sold to the City of New York in 1996. The Heartstart 3000 is powered by a 12-volt lead acid battery. At the beginning of their shift, the two EMTs who assisted Mrs. Joline placed the batteries used by the prior shift into the recharger and replaced them with two newly charged batteries from the EMS office. Each battery was then individually tested in the Heartstart 3000 unit. The EMTs testified that when they tested the batteries, the self-test read "OK" and that there were no readings of low battery or replace battery. The EMTs further testified that when they attempted to use the defibrillator on Mrs. Joline, the unit read "service mandatory" for each battery used and would not operate. The manufacturer's operational manual lists "service mandatory" as a diagnostic message, during which time the unit is disabled. The user is advised to turn the unit off and then on again, and that if this message continues after three on-and-off cycles and after replacing the battery with a fully charged battery, to discontinue use and request service.
 After the failure of the subject defibrillator, the unit and its two batteries were tested by the Fire Department's Technical Services Division-Medical Equipment Unit. A report from the Fire Department states that the unit was found to be operating normally and that both batteries were found to be charge depleted. The unit and the two batteries was also tested by Roy Stengel, a defibrillator technician, employed by Laerdal. Mr. Stengel, at his deposition, stated that when he used either one of the batteries that the EMTs used, the unit malfunctioned in the same manner as when they tried to use the unit on Mrs. Joline. Mr. Stengel found that the battery in the unit was six years old and that the backup battery was 10 years old, and that both batteries were not manufactured by Laerdal. When Mr. Stengel replaced these batteries with a known good battery, the Heartstart 3000 unit functioned properly. Mr. Stengel testified that he tested Heartstart 3000 units and their batteries only if there had been a failure involving a patient, and that between 1997 and August 2000, he had tested 36 Heartstart units used by the Fire Department. In most of these cases the patients had died. Mr. Stengel stated that of the 36 units tested during this time, two or three had good batteries that had not expired and that all of the remaining units had expired batteries which resulted in equipment failure. Mr. Stengel stated that oral and written recommendations had been given to the Fire Department regarding the proper testing of the batteries, and that he had personally informed several Fire Department employees that they should not continue to use outdated batteries. The Heartstart 3000's operational instructions recommend using only high quality and tested batteries [*3]supplied with the device or re-supplied by Laerdal or its authorized distributors, provide instructions for testing and charging batteries and advise that the batteries be replaced if they did not meet the specified capacity test, or after two years, whichever comes first.
It is undisputed that prior to 1996, the City of New York had acquired separate equipment to test the battery capacity and to re-charge the batteries used to operate defibrillators at their Medical Service Unit. The testing equipment was manufactured and sold to the City of New York by Laerdal. Some time in 1998 the Medical Service Unit also had two Centronix BMS-4000 battery testers. A notice entitled "BATTERY PROCEDURE FOR THE HS3000", dated April 29, 1998, was posted on the Medical Service Unit's bulletin board, and set forth the procedure for the use of the Centronix units and provided for the testing, color coding and discarding of batteries based on a specified shock reading.
Plaintiffs Richard Joline, as Administrator of the Estate of Toni Ann Joline, and Richard Joline individually, allege in the complaint causes of action against Laerdal Medical Corporation for negligence, wrongful death, conscious pain and suffering, defective design, breach of express and implied warranty, and strict products liability. Plaintiffs assert that the subject defibrillator failed to function because the City defendants who provided EMS service to Mrs. Joline used batteries that were so old they could not hold a charge once they were under a load required to shock the patient's heart. Plaintiffs also assert that the Heartstart 3000 had a design defect which prevented it from indicating that the battery was low and did not have a proper charge or could not hold a proper charge during the self-test. The causes of action brought on behalf of Mrs. Joline's infant daughter, Jessica Marie Joline, have been dismissed pursuant to an order of this court (Schulman, J.) dated June 12, 2002.
 Defendant Laerdal Medical Corporation now seeks summary judgment dismissing the complaint in its entirety and all cross claims. It is asserted that neither the Heartstart 3000 defibrillator nor the battery charger used by the Fire Department and manufactured by Laerdal were defective in any manner and that the evidence presented herein establishes that the only reason that the Heartstart 3000 defibrillator did not function properly was that the EMTs were using expired batteries that were not manufactured by Laerdal, were not properly charged, and could not hold a charge. It is further asserted that plaintiffs' causes of action based on breach of express and implied warranties are barred by the Statute of Limitations. Finally, it is asserted that the plaintiffs' claims for conscious pain and suffering should be dismissed as Mrs. Joline was not cognitively aware of the alleged pain and suffering.
Plaintiffs, in opposition, have submitted an affidavit from an expert, Saul Miodownik, an electrical engineer, who has knowledge of defibrillating equipment. Mr. Miodownik states that the Heartstart 3000 as designed was defective. He asserts that in order to test the battery or to perform an ECG on a patient, the amount of electrical load on the batteries is 320 milliamp, under which the batteries will hold a charge. In preparing to defibrillate a patient, a dynamic load of 9 amps is required to hold the charge, an amount approximately 28 times that necessary to test the batteries. Mr. Miodownik asserts that there was a measurement variance of +/- .076 volts within the circuitry of the defibrillator at the beginning of the EMTs' shift when the batteries were first tested. It is asserted that the defibrillator could measure the batteries at 11.9 volts by indicating "battery low" or at 11.6 volts by indicating "replace battery", but that a true measurement might have been 11.83 volts or 11.53 volts, respectively. Plaintiffs' expert asserts that if a true measurement had been [*4]made, the EMTs could have replaced the batteries before they went out on their shift. Plaintiffs' expert asserts that the Heartstart 3000's A to D chip and the battery test used by the ambulance crew during the self-power test are inadequate and contained too great a margin of error, and that the self-test failed to provide any information as to the batteries' marginal condition. Mr. Miodownik asserts that Laerdal could have used a higher grade +/- ½ bit resolution 8 bit A to B chip, which would have resulted in an acceptable margin of error, or it could have used a 12 bit A to D chip which would have had 16 times the resolution of the chip used. Mr. Miodownik states that both of these chips were generally available and within the state of art that existed when the Heartstart 3000 was manufactured and sold, and that the additional cost would be in the range of $2.00 to $3.00 per unit. He also asserts that Laerdal should have used software that more comprehensively measured the charge status of the battery during the period of the self-test. Mr. Miodownik, states that in his opinion, within a reasonable degree of engineering certainty, that Laerdal's failure to use the proper A to D chip and to implement a more comprehensive battery test method during its power on self test were substantial factors in the failure of the Heartstart 3000 to function when applied by the EMTs to Mrs. Joline. Mr. Miodownik, also states that the City defendants should have replaced the batteries after two years, as recommended by the manufacturer. He states that the two-year period is based on elementary engineering principles, and has long been recognized as good practice. Finally, Mr. Miodownik states that the failure of the City of New York to have proper systems to ensure that batteries were replaced after two years, or be subjected to a sophisticated dynamic load test on a regular basis, was also a substantial factor in causing the situation where the batteries used by the EMTs attending to a patient were out of date and failed to hold an adequate charge to operate the Heartstart 3000. Plaintiffs assert that based on their expert's opinion, a triable issue of fact exists as to whether the Heartstart 3000 was reasonably safe and whether it was defectively designed. Plaintiffs also assert that the lack of a means for measuring the battery charge rendered the Heartstart 3000 not minimally safe for its intended purpose and, therefore, the manufacturer breached the implied warranty. As regards the claims for conscious pain and suffering, plaintiffs have submitted medical records and affidavits from physicians which provide evidence that Mrs. Joline was continuously medicated for pain management during the last six months of her life and that she reacted to pain stimuli with groans and grimaces. It is, therefore, asserted that Mrs. Joline had sufficient awareness of pain so as to support the claim for conscious pain and suffering.
The City defendants, in opposition to Laerdal's motion, assert that triable issues of fact exist regarding the Heartstart 3000 defibrillator's inability to deliver a shock to the decedent. It is asserted that design defects and technical problems with the unit itself, unrelated to the batteries, may have caused it to not work properly on August 12, 2000. It is asserted that the "service mandatory" message alone did not indicate that the batteries were bad. The City defendants, therefore, assert that as there was nothing to indicate that there was a problem with the batteries, the failure of the Heartstart 3000 defibrillator arose either from a design or manufacturing defect, rather than the failure to use adequately charged batteries. The City defendants have not submitted an affidavit from an expert in support of their claim of a design or manufacturing defect.
The City defendants cross-move for an order granting summary judgment dismissing the complaint on the grounds that no special relationship existed between these defendants and the decedent. It is asserted that the evidence presented fails to show that there was any detrimental reliance on the part of the decedent or that there was any direct contact between the decedent and the [*5]defendants.
Plaintiffs, in opposition, assert that the City defendants owe a duty of care to an emergency medical patient once they began to render treatment and, therefore, owed Mrs. Joline a duty of care. It is asserted that prior to the EMTs' attempt to use the defibrillator, they had rendered significant routine emergency medical treatment to Mrs. Joline which consisted of obtaining a medical history from her mother, assessing her medical status, transferring her to the ambulance, initiating CPR and giving her oxygen. It is asserted that this treatment constituted direct physical contact with Mrs. Joline. It is also asserted that as the EMTs had already arrived on the scene and were providing emergency medical treatment to Mrs. Joline, the plaintiffs are not required to show that she relied upon the defendants to her detriment. Finally, plaintiffs assert that the City defendants' cross motion is untimely as it was served on September 25, 2003, which was more than 120 days after the filing of the note of issue on January 30, 2003.
DefendantLaerdal, in opposition to the City defendants' cross-motion to dismiss the complaint, and in support of its own motion, has submitted an affidavit from Mr. Stengel, as well as an affidavit from its Regulatory Affairs Specialist, Linda Reideburg, formerly Linda Lorain. Mr. Stengel, in his affidavit, summarizes the testimony he offered at his deposition. Ms. Riedeburg, in her affidavit, states that she handles complaints from customers concerning the Heartstart defibrillator and files medical device reports with the FDA. Ms. Riedeburg states that in response to complaints from the City of New York she sent letters to Gregg Burzine at the Medical Equipment Unit recommending that the City use only Laerdal batteries, that it discard the batteries after two years, and that it test for battery capacity, as fully charging the batteries does not mean that the batteries would have sufficient capacity to shock the patient. Ms. Riedeburg submitted copies of letters she sent to the City dated January 12, 1999, January 18, 1999, February 19, 1999, May 12, 1999, January 10, 1999, January 20, 2000, April 14, 2000, April 19, 2000 and May 5, 2000, in which she informed the City that it had used non-Laerdal batteries which failed and that in most of these instances the batteries were long expired and did not have the capacity to support a shock, even if they were fully charged. In the last three letters, Ms. Riedeburg specifically referred the City to the Operating Instructions pertaining to the care of batteries, the use of Laerdal batteries, when to discard batteries and how to test the batteries for capacity. Ms. Riedeburg repeatedly informed the City that the batteries should be replaced after two years. Laerdal has also submitted an affidavit from Donald Garrison, Laerdal's Quality Assurance Manager, who is also an engineer. Mr. Garrison states that the readings obtained by the EMTs establish that the batteries were properly charged, but that they were degraded and could not adequately provide 9 amps current charge which was necessary to deliver a shock. Mr. Garrison states that the current-providing or charge capacity of a battery is not tested in any way by the defibrillator and that such tests are supposed to be performed by the party using the defibrillator through the use of separate testing equipment. Mr. Garrison asserts that in 1995, when the unit in question was manufactured, it was standard practice for such devices to offer lead-acid batteries for use in infrequent applications such as the EMS program, and that all such units offered external simulator/test loads which could perform the daily shock test of each unit, as recommended by the FDA Defibrillation Working Unit. Mr. Garrison further asserts that none of the leading units profiled in 1995 offered in-unit battery capacity testing of their lead acid batteries. Mr. Garrison states that the American Heart Association had identified the "time to shock" as a critical performance parameter and recommended all automated external defibrillators be able to [*6]provide three full energy shocks within 90 seconds of power-on. Mr. Garrison asserts that additional battery measurements at 9 amps to assess the battery's capacity during the Heartstart's self-test were not included in the self-test checks as such a test would further reduce the battery's capacity and affect the unit's "time to shock" performance. In addition, Mr. Garrison asserts that the use of separate testing equipment enables the tester to test numerous defibrillators and batteries, that this is cost effective and does not have a detrimental effect on either the defibrillator or the batteries. Mr. Garrison also states that the lead-acid battery's internal resistence is dependent on uncontrollable variables such as user maintenance, re-charge regimens, battery age and physical condition which necessitates the use of external test equipment in order to verify the battery's capacity and, thus, its suitability for use in a defibrillator. Mr. Garrison asserts that in the case of Mrs. Joline, the defibrillator was unable to deliver a shock due to battery failure, as the batteries used by the EMTs were too old and lacked the capacity to hold the charge necessary to enable the defibrillator to shock the patient. He states that the battery failure in this instance was not indicative of any defect, and that it was never intended that the defibrillator be designed so as to be able to measure the battery's capacity to hold a charge and that the plaintiff's expert does not claim that it should have been designed to take such measurements.
Laerdal asserts that triable issues of fact exist as to the negligence of the City defendants. It is asserted that the City defendants' use of outdated batteries that could not hold a charge was the cause of the failure of the Heartstart 3000 defibrillator; that once the City defendants decided to equip its ambulances with the defibrillators and batteries, they had a duty to ensure that the equipment was in proper working order; that the City had a duty to Mrs. Joline as she was in the class of people who are in need of defibrillation, as opposed to the general public; and that the City defendants were advised that they should refrain from using non-Laerdal batteries, that they should not use batteries that were more than two years old and that the batteries should be tested for capacity prior to use.
 Defendant Laerdal Medical Corporation's motion to dismiss the complaint and all cross-claims is granted. In a products liability case, a plaintiff may ground his action on four theories: (1) negligence, (2) breach of express warranty, (3) breach of implied warranty, and (4) strict liability. (Voss v Black & Decker Manufacturing Company, 59 NY2d 102; Victorson v Bock Laundry Mach. Co., 37 NY2d 395.) A "defectively designed product is one which, at the time it leaves the seller's hands, is in a condition not reasonably contemplated by the ultimate consumer and is unreasonably dangerous for its intended use; that is one whose utility does not outweigh the danger inherent in its introduction into the stream of commerce." (Robinson v Reed-Prentice Div. of Package Mach. Co., 49 NY2d 471, 479.) Strict products liability for design defect differs from a cause of action for a negligently designed product in that the plaintiff is not required to prove that the manufacturer acted unreasonably in designing the product. A strict liability cause of action which is based upon a design defect is actionable where a product is not reasonably safe for its intended use and the defective design was a substantial factor in causing plaintiff's injury. (See, Denny v Ford Motor Co., 87 NY2d 248, 257; Voss v Black & Decker Mfg. Co., 59 NY2d 102, 106-107; Codling v Paglia, 32 NY2d 330, 342; Haight v Banner Metals, Inc., 300 AD2d 356.) In order to establish a prima facie case of strict products liability based on a defectively designed product, it is well established that a plaintiff must plead and prove that there was a feasible design alternative that would have made the product safer. (Voss v Black & Decker Mfg. Co., supra.)
[*7] Here, plaintiffs do not assert that the decedent sustained injuries as a result of the EMTs' use of the defibrillator. Rather, it is asserted that Mrs. Joline's injuries were the result of the defibrillator's failure to produce a shock to her heart. Plaintiffs have offered no evidence that Laerdal acted unreasonably in designing the Heartstart 3000. Plaintiffs, therefore, cannot maintain a cause of action against Laerdal on the grounds that the product was negligently designed.
Plaintiffs' causes of action against Laerdal for breach of express warranty and for breach of implied warranty are also dismissed as these claims are untimely. The period of limitations for breach of warranty claims is four years, measured from the tender of delivery. (UCC § 2-725[1][2]; Heller v U.S. Suzuki Motor Corp., 64 NY2d 407; Cohoes v Kestner Engineers, P.C., 226 AD2d 914.) Inasmuch as the Heartstart 3000 defibrillator was sold and delivered to the City defendants in 1996, plaintiffs' breach of warranty claims are barred by the Statute of Limitations.
Plaintiffs' claim based on strict products liability is also dismissed. Although in a strict products liability case alleging design defect it is generally for the jury to weigh the product's risks against its utility and to determine whether the product was unreasonably dangerous (see, Voss v Black & Decker Mfg. Co., 59 NY2d 102, 109), it is the plaintiff's burden in the first instance to make out a prima facie case. (See, Scarangella v Thomas Built Buses, 93 NY2d 655, 659; Fallon v Hannay & Son, 153 AD2d 95, 99.) The evidence presented by plaintiffs is insufficient to make out a prima facie case of a design defect. In support of the claim that the Heartstart 3000 was defectively designed, plaintiffs' engineering expert only asserts that the unit's electronic circuitry failed to make a true measurement of the batteries' voltage, and he offered an alternative design to measure the voltage. Plaintiffs' engineering expert, however, failed to offer any alternative design that would test the batteries' capacity to hold a charge or to charge the batteries so that they would be capable of holding a charge. The court, therefore, finds that plaintiffs' expert has failed to raise a triable issue of fact as to whether the defibrillator, as designed, was not reasonably safe for its intended purpose, which was to deliver a shock to a patient suffering cardiac arrest. (See generally, Denny v Ford Motor Co., 87 NY2d 248, 258-259; Cervone v Tuzzolo, 291 AD2d 426, 427; Affuso v Crestline Plastic Pipe Co., 194 AD2d 884; Schimmenti v Ply Gem Indus., 156 AD2d 658, 659.)
 Although the existence of a defect may be inferred from proof that the product did not perform as intended, the inference does not arise here in view of plaintiffs' failure to exclude all other causes of the defibrillator's failure to perform not attributable to the manufacturer. (See, Halloran v Virginia Chems., 41 NY2d 386, 388; Rosa v GMC, 226 AD2d 213.) Plaintiffs' engineering expert has offered alternative theories, apart from the alleged design flaws, as to why the Heartstart 3000 failed to function. He maintains that the alleged design flaws does not excuse the City defendants' failure to track the age and condition of the batteries, and their failure to follow the manufacturer's and industry standards which recommend that batteries be discarded after two years. This expert determination that the batteries used by the EMTs were 6 and 10 years old, could not be properly charged and could not hold the power necessary to deliver a shock, has not been challenged by the defendants.
 Plaintiffs' cause of action against Laerdal for conscious pain and suffering as well as the cause of action for wrongful death are also dismissed, as these claims are dependent upon the dismissed causes of action.
 The City defendants' cross-motion to dismiss the complaint is denied in its entirety. [*8]It is well settled that a municipality is immune from negligence claims arising out of the performance of its governmental functions unless the injured person establishes a special relationship with the municipality which would create a special duty of protection with respect to that individual. (See, Kircher v City of Jamestown, 74 NY2d 251, 255-256; Bonner v City of New York, 73 NY2d 930, 932; Cuffy v City of New York, 69 NY2d 255, 260.) Plaintiffs have not made a sufficient showing of the existence of a special relationship. However, even when no original duty is owed to an individual to undertake affirmative action, once it is voluntarily undertaken, it must be performed with due care. (See, Parvi v City of Kingston, 41 NY2d 553, 559; Fonville v New York City Health and Hospitals Corporation, 300 AD2d 623; Persaud v City of New York, 267 AD2d 220.) Here, the Fire Department's EMTs undertook affirmative action to treat Mrs. Joline at the scene and, therefore, were required to do so with due care. (See, Fonville v New York City Health and Hospitals Corporation, id.) To the extent that plaintiffs' medical expert's affirmation alleges that the EMTs departed from proper practice in not using a defibrillator that was capable of producing a shock, triable issues of fact exist as to whether the City defendants were negligent.
The City defendants' sole argument in support of its cross-motion for summary judgment dismissing the complaint in its entirety is that in the absence of a special relationship it did not owe any duty to Mrs. Joline. As regards plaintiffs' claim of conscious pain and suffering, the City defendants failed to raise any arguments and failed to proffer any medical evidence which would warrant the dismissal of this cause of action. In support of defendant Laerdal's motion for summary judgment, granted on other grounds, Oscar B. Garfein, M.D., a cardiologist, set forth that "...from the time that EMTs arrived at the scene, unit [sic] her death, the decedent could not have possible [sic] experienced any conscious pain and suffering." In opposition to the motion, Jerry G. Kaplan, M.D., a neurologist, expressed his opinion, based on the medical records, that the decedent "...did, unfortunately, suffer pain of which she was aware before her death". In addition, plaintiffs have submitted copies of the decedent's medical records and an affidavit attesting to the fact that pain medication was administered to the decedent on a regular basis during the last six months of her life.
The court notes that, in order to recover damages for pain and suffering, an injured plaintiff must have some level of awareness. (See, McDougald v Garber, 73 NY2d 246, 255; Ramos v Shah, 293 AD2d 459, 460.) Had defendant City of New York raised the issue of conscious pain and suffering, plaintiffs have, in any event, submitted sufficient evidence to raise a triable issue of fact as to whether Mrs. Joline experienced conscious pain and suffering. (See, McDougald v Garber, supra; Weldon v Beal, 272 AD2d 321, 322; Walsh v Staten Is. Obstetrics & Gynecology Assocs., 193 AD2d 672.)
 In view of the foregoing, defendant Laerdal Medical Corporation's motion to dismiss the complaint and all cross-claims
as against it is granted, and the City defendants' cross-motion to dismiss the complaint is denied in its entirety.
Settle order.
 
 J.S.C.
[*9]
Decision Date: March 25, 2004